**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:19-CV-00153-KDB-DCK**

| | |
|---|---|
| **DIANE SKINDER,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **FEDERAL EXPRESS LONG TERM DISABILITY PLAN,** | |
| **Defendant.** | |

**IN THIS MATTER** Plaintiff Diane Skinder contends that Defendant Federal Express Long Term Disability Plan (the "Plan") violated the Employee Retirement Income Security Act ("ERISA") in September 2018 by terminating long-term disability benefits that she had been receiving under the Plan since 2004. Now before the Court are the Parties' cross Motions for Summary Judgment, (Doc. Nos. 33, 35), on her claims. The Court has carefully considered these motions and the Parties' briefs and exhibits. For the reasons discussed below, the Court will DENY Defendant's motion and GRANT Plaintiff's motion to the extent that she seeks to remand this matter for a full and fair review of her claim for long term disability benefits.

## LEGAL STANDARD

ERISA benefit actions are usually adjudicated on summary judgment rather than at trial. *See Vincent v. Lucent Techs., Inc.*, 733 F. Supp. 2d 729, 733–34 (W.D.N.C. 2010), aff'd, 440 F. App'x 227 (4th Cir. 2011). Here, both parties have moved for summary judgment and agree this matter is ripe for summary adjudication.

1

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568); *see Smith v. Collins*, 964 F.3d 266, 274 (4th Cir. 2020). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs*, 780 F.3d at 568-69 (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

## FACTS AND PROCEDURAL HISTORY

The Plan under which Plaintiff seeks disability benefits is an employee welfare benefit plan as described in Section 3(1) of ERISA, (29 U.S.C. § 1002(1)). The Plan was established and is maintained by Federal Express Corporation ("FedEx") to provide for the funding and payment of long-term disability benefits for its employees. (AR 01260).[1] Claims for benefits under the Plan

---

[1] The Court will cite to the Administrative Record filed by the Parties, (Doc. No. 16), as "AR."

are currently administered by Aetna Life Insurance Company ("Aetna"), FedEx's designated Claims Paying Administrator,[2] (AR 00001, 01262 (LTD Plan § 1.1(e))), who has been delegated discretionary fiduciary authority to determine claims and review claim decisions under the Plan. (AR 01330 - 01342).

FedEx employees covered by the Plan are eligible to receive disability benefits from the Plan if they become "Disabled" as defined by the Plan. (AR 01278 (LTD Plan § 3.1))). The Plan includes the following relevant definitions and terms:

> "Disability" or "Disabled" shall mean either an Occupational Disability or a Total Disability; provided, however, that a Covered Employee shall not be deemed to be Disabled or under a Disability unless he is, during the entire period of Disability, under the direct care and treatment of a Practitioner and such Disability is substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms. (AR 01264).
>
> …
>
> "Total Disability" shall mean the complete inability of a Covered Employee, because of a medically-determinable physical impairment (other than an impairment caused by a mental or nervous condition or a Chemical Dependency), to engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training or experience. (AR 01273).
>
> …
>
> "Proof of Disability" - No Disability Benefit shall be paid under the Plan unless and until the Claims Paying Administrator has received an application therefor and information sufficient for the Claims Paying Administrator to determine pursuant

---

[2] The original Claims Paying Administrator on Plaintiff's claim was Kemper National Services. Kemper National Services then became part of Broadspire Services, Inc. which then became a part of Aetna Life Insurance Company. Aetna Life Insurance Company was the Claims Paying Administrator at the time Plaintiff's claim was denied effective September 30, 2018. To avoid unnecessary complication, the Court will simply refer to all the different Claims Paying Administrators as Aetna.

3

to the terms of the Plan that a Disability exists. Such determination shall be made in a fair and consistent manner for all participants in the Plan. Such information may, as the Claims Paying Administrator shall determine, consist of a certification from the Covered Employee's attending Practitioner, in the form prescribed by the Claims Paying Administrator, information in the form of personal references, narrative reports, pathology reports, x- rays and any other medical records or other information as may be required by the Claims Paying Administrator. In addition, a Covered Employee may be required, as the Claims Paying Administrator shall determine, to submit continuing proof of Disability in the form of the information described above, as well as evidence that he continues to be under the care and treatment of a Practitioner during the entire period of Disability. If, in the opinion of the Claims Paying Administrator, the Practitioner selected by the Covered Employee cannot substantiate the Disability for which a claim is being made or benefits are being paid hereunder, such Employee may be required to submit himself to an examination by a Practitioner selected by the Claims Paying Administrator. (AR 01305-06).

The Plan provides long-term disability benefits equal to 60% of a covered employee's monthly income for up to two years if the covered employee suffers from an Occupational Disability. (AR 01268 - 01269, 01278 (Plan §§ 1.1(u), 3.1, 3.2(a))). To receive long-term disability benefits from the Plan for longer than two years, a disabled covered employee must be Totally Disabled, that is, she must not be able to engage in any compensable employment for twenty-five hours per week. (AR 00465, 01273 (Plan § 1.1(gg), 3.3(b)(3)(i))).

Plaintiff began working for FedEx on October 16, 1998 as a Senior Account Executive. (AR 00567). Plaintiff had lumbar spine surgery in March 1999 and December 2001. In 2001, Plaintiff stopped working due to diagnoses of postlaminectomy syndrome, degenerative disk disease, radiculopathy, foraminal stenosis, spondylosis, and a herniated disc. (AR 00005). Other relevant diagnoses included sciatica, failed back syndrome, chronic low back pain, bilateral peripheral neuropathy, myofascial pain syndrome, thoracic back pain, insomnia, sacroiliitis with sacroiliac joint dysfunction, etc. (*Id*). Plaintiff filed a claim for short term disability and was approved for those benefits beginning on December 24, 2001. (*Id*). Plaintiff then filed a claim for

4

long term (occupational) disability benefits and was approved for those benefits beginning on June 24, 2002 based on her inability to perform her own occupation on a full-time basis. (*Id*).

After two years of receiving occupational disability benefits Plaintiff applied for long term "total disability" benefits. After initially denying her claim based on alleged "insufficient quantitative objective physical findings" to support a determination that Plaintiff was unable to engage in any compensable employment for a minimum of 25 hours per week, (AR 00416), Aetna requested that Plaintiff undergo a Functional Capacity Evaluation (FCE), which she did on November 22, 2004. The FCE found that Plaintiff "does not currently demonstrate the capabilities to tolerate a return to Sedentary level work for an 8-hour day according to the Department of Labor standards" (although it found she could tolerate a 4-hour workday with restrictions). Relying on that FCE, Aetna found that Plaintiff was "totally disabled" as defined by the Plan and approved her claim for long term disability. Thereafter, the Plan paid Plaintiff long term "total disability" benefits from June 24, 2004 through September 30, 2018.

During these fourteen years of long term disability benefits, Plaintiff's physicians consistently opined that Plaintiff would be unable to work in any occupation for a minimum of 25 hours per week. On February 16, 2011, September 30, 2011, April 18, 2012, April 15, 2013, March 19, 2014, April 14, 2015, and May 20, 2015, Plaintiff's treating physicians opined that she was "unable to work at any compensable employment for a minimum of twenty-five hours per week." (AR 00295, 00301, 00313, 00318, 00331, 00386, 00389). There are also several Physician Reports and Medical Assessment Questionnaires in the administrative record completed by Plaintiff's treating physicians regarding her inability to work. (AR 00164-67, 00203-06, 00252, 00281, 00285, 00287, 00288). For example, Dr. Arnold Schwartz provided several statements on

5

Plaintiff's behalf advising that "she will never return to work," "she is disabled and will never return to work," "she is totally disabled," "she continues to be disabled," and "it is unlikely she will ever return to work." (AR 00115, 00196, 00198, 00251, 00275, 00280).

More recently, Plaintiff saw doctors in Gozo, a Maltese island in the Mediterranean where she has lived since 2017. In February 2018, Dr. N. Gatt Ellis authored a letter on Plaintiff's behalf which stated: "This is to certify that I have been seeing … Diane Skinder regularly in my clinic regarding her spinal issue. She continues to be suffering from her disability as previously noted." (AR 0407). On October 3, 2018, Dr. Ellis wrote:

> This is to certify that I have examined Ms. Diane Skinder at my clinic several times during the past year in view of Low Back Pain, anxiety, and insomnia. … Her past medical history includes –
> Low back pain
> Recurrent Bilateral sciatica with flare ups more on the Rt.
> Postlaminectomy syndrome
> Bilateral neuropathy
> . . .
> She is not improving so I have referred her for Physiotherapy and to a Neurologist in Malta in view of her multiple complaints.
> In the meantime, she is still disabled from doing any constant job.

(AR 0408-09). On October 3, 2018, Dr. Ellis also noted that when seen on August 21, 2018, Plaintiff's exam was normal except Romberg's testing was positive. Babinski was downgoing bilaterally, tandem gait was equivocal, straight leg raise testing was normal, there was no Pyramidal drift and power, and sensation, and reflexes in both your upper and lower extremities were normal.

On October 19, 2018 Aetna asked a physician associated with "Reliable Review Services," Dr. Gary Nudell, to review Plaintiff's claim. The record does not reflect the genesis of Aetna's decision to reexamine Plaintiff's claim for long term disability benefits and there is no evidence

that Plaintiff was informed that Aetna was conducting a reexamination, although Dr. Nudell did speak with Dr. Ellis as part of his review.[3] On October 30, 2018, Dr. Nudell issued a report of his review of Plaintiff's medical records[4] and conversation with Dr. Ellis, concluding that "I would opine that the available documentation does not support impairment from engaging in any compensable employment for a minimum of 25 hours per week." (AR 00427). Apparently based on this report, Aetna wrote to Plaintiff on November 15, 2018 informing her that her file had been reviewed and "it has been determined that no benefits are payable to you" on her claim for disability benefits beyond September 30, 2018. (AR 00013-00015). Again, although the Plan had been paying Plaintiff "total disability" benefits since 2004 without any apparent problems, Aetna did not seek or obtain any further information from Plaintiff prior to making its decision to terminate her benefits.

In Aetna's benefit termination letter, it informed Plaintiff of her right to appeal the decision and she did so on December 5, 2018. (AR 00019). In response to Plaintiff's appeal, Aetna, in a

---

[3] According to Dr. Nudell, Dr. Ellis told him that she had evaluated Plaintiff over the past year for "ongoing low back pain and a right side facial palsy." She also said that she had referred Plaintiff to a neurologist (she didn't know if Plaintiff had yet been evaluated) and refilled various prescriptions (which are not listed). When asked to comment on "functional impairment," Dr. Ellis purportedly said that she "does not perform functional capacity assessments" and was unable to make specific assessment of functional restrictions / limitations. However, Dr. Nudell reported that Dr. Ellis told him that "the claimant should likely have another MRI performed of her lumbar spine secondary to chronic back pain" as part of that assessment. There is no evidence that Dr. Ellis in any way recanted her then recent October 3, 2018 opinion that Plaintiff was "still disabled from doing any constant job," a conclusion that Dr. Nudell's report fails to mention. Further, as discussed below, Aetna did not request that Plaintiff obtain an MRI to document any "functional impairment." *See* AR 00423-00428.

[4] With the exception of one medical note from 2008, the records reviewed by Dr. Nudell were during the period from 2011-2018 and did not include the functional assessment from 2004 on which Aetna had relied in approving and paying Plaintiff's claim until 2018.

7

letter dated December 14, 2018, advised Plaintiff that she had until December 23, 2018 to send any additional information pertaining to her disability claim from each of her treating providers in support of her appeal. (AR 00410). On January 4, 2019 Plaintiff requested additional time to respond to the termination of benefits. Aetna granted Plaintiff's request through February 6, 2019, noting, however, that "no further requests will be granted." (AR 00412). On January 29, 2019, Dr. Adrian Pace, a Malta neurologist, provided a statement on Plaintiff's behalf. In that statement Dr. Pace reported:

> "This is to certify that Ms. Skinder is currently under my care within the department of neurology at Gozo General Hospital. She is currently undergoing investigations and management for a number of chronic neurological issues including:
>
> Chronic low back pain despite two surgical procedures to her lumbar spine in 1999 and 2001 for lumbar radiculopathy
> Neuromuscular scoliosis in her thoracic spine
> Right sided sciatic
> Painful peripheral neuropathy since 2006 (awaiting nerve conduction studies; presumed small fibre neuropathy in aetiology).
>
> She remains significantly impaired in the performance of most activities of daily living by her symptoms, especially her chronic pain.

(AR 00026-27). On February 22, 2019, Aetna issued a second denial letter that "superseded" (but was substantially identical to) Aetna's November 15 letter. (AR 00009-00012). Aetna's February 22 letter made no mention of Dr. Pace's most recent medical opinion and does not list his report among the many medical records Aetna claimed to have reviewed in making its decision to terminate benefits.

In April and May 2019, Aetna received reports from three other "peer review" doctors affiliated with "Reliable Review Services" who reviewed Plaintiff's medical records and all concluded "there is no significant objective clinical documentation that reveals a functional

impairment that would preclude the claimant from engaging in any compensable employment for a minimum of 25 hours a week" since October 1, 2018 so Plaintiff would not be totally disabled under the Plan's definition. (AR 00429-00433, 00434-00444, 00445-00450, 00451-00456, 00457-00464). These "peer review" doctors dismissed the October 2018 and January 2019 reports of Plaintiff's treating physicians as allegedly lacking medical records substantiating a medical exam and imaging and any "functional capacity." (See AR 00432). Copies of these "peer review" opinions were not contemporaneously provided to Plaintiff and she had no opportunity to specifically respond to the reports.

On June 14, 2019, Aetna's Appeal Review Committee ("Committee"), without any additional information from Plaintiff, issued a final denial letter upholding the denial of "total disability" benefits effective October 1, 2018. (AR 0000-00003). In the letter, the Committee said that it had considered all the submitted documentation and "noted the conclusions of the peer physicians," concluding that:

> The submitted clinical documentation provided no updated diagnostic studies or any significant measured deficits in range of motion, strength or neurological deficits to support a continued total disability. In summary, although you continued to have complaints, the submitted clinical data failed to provide any correlating significant objective findings to support a continued inability to engage in any compensable employment for a minimum of twenty-five hours per week for which you are reasonably qualified (or could reasonably become qualified) on the basis of your ability, education, training or experience effective 10/01/18.

(AR 00003).

Finally, the June 2019 denial letter informed Plaintiff that the Committee's decision represented the final step of the administrative review process and of her right to bring a civil action under Section 502(a) of ERISA. Having thus exhausted her internal appeals, Plaintiff filed

this lawsuit on November 20, 2019, seeking long term disability benefits under the total disability provisions of the Plan. (Doc. 1).

## DISCUSSION

"ERISA is a 'comprehensive' and 'closely integrated regulatory system' that is 'designed to promote the interests of employees and their beneficiaries in employee benefit plans.'" *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 257–58 (4th Cir. 2005) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990)). A participant or beneficiary of a plan covered under ERISA may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The scope of judicial review in an action challenging an administrator's coverage determination under section 1132(a)(1)(B) turns on whether the benefit plan vests the administrator with discretionary authority. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Helton v. AT & T Inc.*, 709 F.3d 343, 351 (4th Cir. 2013).

When a plan does not vest the administrator with discretionary authority, a district court reviews the administrator's coverage determination *de novo*. *Helton*, 709 F.3d at 351 (citing *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629 (4th Cir. 2010)). In contrast, when a plan vests the administrator with discretionary authority to make eligibility determinations, a district court reviews the administrator's decision under an abuse of discretion standard. *See Helton,* 709 F.3d at 351." *Wilkinson v. Sun Life & Health Ins. Co.*, 674 Fed. Appx. 294, 299 (4th Cir. 2017). Here, the Parties agree that Aetna was delegated and exercises discretionary authority to determine if Plan participants are entitled to long term disability benefits under the Plan. Therefore, it is

10

necessary to decide "only the contractual questions of whether the administrator exceeded its power or abused its discretion because only those inquiries are relevant to whether the administrator's decision breached the contractual provision." *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 378 (4th Cir. 2018) (quoting *Firestone*, 489 U.S. at 111).

Under the abuse of discretion standard, this Court will uphold the decision of a plan administrator if the decision is reasonable, even if this Court would have reached a contrary conclusion upon an independent review. *See Fortier v. Principal Life Ins. Co.*, 66 F.3d 231, 235 (4th Cir. 2012). A decision is reasonable when the decision "is the result of a deliberate, principled reasoning process, and is supported by substantial evidence . . . ." *Helton,* 709 F.3d at 351 (internal quotation marks and citation omitted). "Substantial evidence" is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Carroll v. Eaton Corp. Long Term Disability Plan*, 2017 U.S. Dist. LEXIS 63689, at *18 (D.S.C. Mar. 15, 2017) (quoting *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984)). The administrator's decision must "rest on good evidence and sound reasoning" and result "from a fair and searching process." *Harrison v. Wells Fargo Bank, N.A.,* 773 F.3d 15, 21 (4th Cir. 2014) (quoting *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322–23 (4th Cir. 2008)).

A reviewing court should also keep in mind that "what is being reviewed here is not the findings of an agency but rather the decision of private trustees based on evidence collected by a hearing officer employed by a private trust," and that "those close to the trust indeed have a duty to preserve the corpus of that trust and, accordingly, are naturally disinclined to make awards from it." *Odle v. UMWA 1974 Pension Plan*, 777 F. App'x 646, 649 (4th Cir. 2019) (quoting *Maggard v. O'Connell*, 671 F.2d 568, 571 (D.C. Cir. 1982)). Although this structural conflict of interest

does not alter our standard of review, the presence of a such a conflict is "one factor among many that a reviewing judge must take into account." *Williams*, 609 F.3d at 631 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

Also, in evaluating whether a plan administrator abused its discretion, the Fourth Circuit has identified the following eight nonexclusive "*Booth* factors": (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *See Booth v. Wal–Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000); *Wilkinson*, 674 Fed. Appx. at 299-300. All eight *Booth* factors need not be, and may not be, relevant in a given case. *Helton v. AT&T, Inc.*, 709 F.3d 343, 357 (4th Cir. 2013).

As discussed further below, the Court finds that the Plan abused its discretion in terminating Plaintiff's long term disability benefits because the decision was not the result of a deliberate, principled reasoning process nor supported by substantial evidence. There are two primary reasons, either of which would independently support the Court's decision, for this finding. First, there were structural failures in Aetna's consideration of Plaintiff's claim. Aetna initially failed to consider Plaintiff's most recent physician's reports in its February 22, 2019 denial letter (after giving Plaintiff more time to provide the information it did not consider) and, even more significantly, heavily relied on numerous new physician "peer review" reports in its final

ruling on Plaintiff's *appeal* of the termination of benefits, which Plaintiff never received nor had an opportunity to rebut. Second, the Court finds that consideration of the relevant *Booth* factors supports Plaintiff's position in light of the unique circumstances of this case, where the Plan terminated Plaintiff's benefits after 17 years based on evidence that had for many years been sufficient to support her eligibility for benefits and without telling her – with specificity – what medical tests and functional assessments it now required to continue providing benefits.

### The Plan's Failure to Consider Evidence and Allow Plaintiff to Respond to Evidence

ERISA requires that every employee benefit plan "afford a reasonable opportunity to any participant whose claim for benefits has been denied a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133 (2008). More specifically, the plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits ... has been denied, setting forth the specific reasons for such denial." *Id.* A fiduciary reviewing a denial of ERISA benefits must satisfy certain "core requirements" before its review can be deemed "full and fair." *Hedrick v. AT&T Umbrella Benefit Plan No.1*, No. 1:19-CV-971, 2021 WL 602632, at *8 (M.D.N.C. Feb. 16, 2021); *Sawyer v. Potash Corp. of Saskatchewan (Potashcorp)*, 417 F. Supp. 2d 730, 744 (E.D.N.C. 2006), *aff'd sub nom. Sawyer v. Potash Corp. of Saskatchewan*, 223 F. App'x 217 (4th Cir. 2007). The "core requirements" set forth in the Code of Federal Regulations implementing the statutory requirements mandate that (1) a claimant have at least sixty days to appeal an initial denial of benefits; (2) a claimant have an opportunity to submit written comments, documents, records, and other information relating to his claim; (3) a claimant have reasonable access to relevant documents in the administrator's possession; and (4) the administrator must take into account all comments, documents, records, and other information

13

submitted by the claimant. *Id.* (citing 29 C.F.R. § 2560.503-1(h)(2)); *see also Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 235 (4th Cir. 2008).

Aetna failed to fully satisfy these core requirements for a full and fair review. After Aetna's agreement in early January 2019 that Plaintiff could have another month until February 6, 2019 to provide additional information, Plaintiff provided Aetna with a report from her Dr. Pace, her treating neurologist, in support of her disability claim. However, in its February 22, 2019 denial letter, which specifically states that it "supersedes the letter sent on 11/15/18," Aetna did not discuss Dr. Pace's letter nor even list it among the information that had been reviewed. *See* AR 00010. Indeed, the denial letter falsely stated that "there are no recent … neurological exams documented to support a disability."[5] *Id.* Therefore, Aetna failed in its obligation to "take into account all comments, documents, records, and other information submitted by the claimant." 29 C.F.R. § 2560.503-1(h)(2).[6]

Further, Plaintiff was denied reasonable access to relevant documents in the administrator's possession. As part of the "full and fair review" which ERISA requires, the claimant must "be given reasonable access to documents relevant to her claim." *Gagliano*, 547 F.3d at 235; *see* 29 C.F.R. § 2560.503–1(h)(2)(iii) (providing "that a claimant shall be provided, upon request and free

---

[5] The February 22, 2019 denial letter also incorrectly said that Plaintiff had presented no recent records from a pain management specialist. On January 29, 2019, Plaintiff underwent a radiofrequency pain management procedure with Dr. Marilyn Casha, which was communicated to Aetna on February 5, 2019. *See* AR 00028 – 00030. Thus, like Dr. Pace's letter, Aetna also failed to consider Dr. Casha's report in its decision to terminate Plaintiff's benefits.

[6] The Aetna Appeals Committee did reference Dr. Pace's and Dr. Casha's reports in its June 2019 letter denying Plaintiff's appeal of the termination of her disability benefits; however, Aetna's failure to consider these most recent doctor reports in the first instance violated its duty under the regulation and left Plaintiff with no notice of how Aetna viewed the reports until the matter was already administratively concluded.

14

of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits"). Under the regulations, a document, record, or other information is considered "relevant" to a claim if it "[w]as relied upon" or "submitted, considered, or generated in the course of making the benefit determination." 29 C.F.R. § 2560.503–1(m)(8). *See Odle*, 777 F. App'x at 650.

This statutory requirement extends to any new grounds for adverse benefits determinations given in final denial letters because those new grounds are effectively initial denials on the new grounds. *See Gagliano*, 547 F.3d at 236. Here, after Plaintiff filed her appeal, Aetna obtained three new "peer review" medical reports from an outside agency that it plainly relied on in denying Plaintiff's appeal but which Plaintiff had no opportunity to rebut, thereby violating ERISA's procedural requirements.[7] Procedural guidelines including the right to a full and fair review "are at the foundation of ERISA." *Odle*, 777 F. App'x at 651. Thus, as the Fourth Circuit articulated in *Gagliano*, such a violation requires "remand to the plan administrator for the 'full and fair review' to which [plaintiff] is entitled." *Gagliano*, 547 F.3d at 241.

### **The Plan's Decision Cannot be Upheld under the *Booth* Test**

The second independent reason supporting the Court's conclusion that the Plan's termination of Plaintiff's disability benefits was not the result of a deliberate, principled reasoning process nor supported by substantial evidence is that the Plan's decision cannot be upheld under the *Booth* test. Again, the Booth factors that may be considered are:

---

[7] And, this "procedural" failure had real substantive impacts. Just as one example, had Plaintiff been aware that the peer reviewers had effectively dismissed her neurologist and pain management doctor's reports because they had been unable to speak with them to discuss her condition and treatment (which was, of course, not Plaintiff's fault) she could have made an effort to encourage and arrange for her doctors to talk to them.

15

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth,* 201 F.3d at 342–43. Plaintiff, but not the Defendant,[8] has presented argument to the Court regarding the *Booth* factors. The Court finds, consistent with Plaintiff's position, that factors 1, 4, and 5 are the most relevant in this case (along with factor 6, which independently requires remand as discussed above). The Court will evaluate each of these factors in turn.

### 1. The Language of the Plan

The Plan defines "disability" as being "the complete inability of a Covered Employee, because of a medically-determinable physical impairment … to engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified … ." (AR 01273). While the Parties dispute the reasonableness of Aetna's investigation of Plaintiff's claim and Aetna's conclusion on whether she is disabled, the Plan's language regarding what is a covered "total disability" does not favor either party. However, the Plan's language concerning "Proof of Disability" supports Plaintiff's argument that Aetna abused its discretion. "Proof of Disability" is defined under the Plan, in part, as follows:

> [Information sufficient to determine if a Disability exists] may, as the Claims Paying Administrator shall determine, consist of a certification from the Covered Employee's attending Practitioner, in the form prescribed by the Claims Paying Administrator, information in the form of personal references, narrative reports, pathology reports, x- rays and any other medical records or other information as

---

[8] Instead of addressing the specific *Booth* factors, Defendant chose to broadly argue that the Plan's termination of Plaintiff's long term disability benefits was reasonable and therefore should be upheld under an abuse of discretion standard.

16

may be required by the Claims Paying Administrator. In addition, **a Covered Employee may be required, as the Claims Paying Administrator shall determine, to submit continuing proof of Disability in the form of the information described above**, as well as evidence that he continues to be under the care and treatment of a Practitioner during the entire period of Disability. **If, in the opinion of the Claims Paying Administrator, the Practitioner selected by the Covered Employee cannot substantiate the Disability for which a claim is being made or benefits are being paid hereunder, such Employee may be required to submit himself to an examination by a Practitioner selected by the Claims Paying Administrator.**

(AR 1305-06) (emphasis added). Having received long term disability benefits for many years, Plaintiff plainly had satisfied her initial obligation to establish her entitlement to benefits. So, according to the Plan, it was up to Aetna to require "continuing proof of Disability" in the form determined by Aetna and, if Aetna believed Plaintiff had not substantiated her claim, then Aetna could require her to submit herself to an examination. While the Court does not find that this Plan language necessarily requires Aetna to ask a claimant to undergo a physical examination prior to terminating benefits in all circumstances,9 the language does require that Aetna tell a claimant what information must be produced to continue to receive benefits. Thus, particularly in circumstances such as this one where Aetna used evidence that had previously supported continuing benefits to now terminate those same benefits, it was incumbent on Aetna to tell Plaintiff – with specificity and in advance of the termination of her benefits – what information she was required to provide to maintain her benefits. Accordingly, Aetna's termination of Plaintiff's benefits on November 15, 2018 without prior notice is inconsistent with the Plan language. Therefore, the first *Booth* factor favors Plaintiff.

_____

9However, the Plan language does strongly suggest that Aetna should require a physical examination when it cannot substantiate a disability claim, at least where, as here, the primary purported reason for the denial of benefits is the absence of physical exam findings. Thus, this is an additional reason why the Plan language supports Plaintiff's position.

2. <u>The Purpose and Goals of the Plan</u>

While it is not a primary factor in the Court's analysis, the Court does note that the second *Booth* factor – the purpose and goals of the Plan – favors the Plaintiff. Through the Plan, FedEx intended to provide a financial safety net for its employees who suffer a disabling illness and are unable to continue working. Plaintiff was an employee in good standing and, as acknowledged by the Plan for 17 years, became disabled and unable to perform either her prior occupation or any occupation for a minimum of 25 hours per week. Thus, providing long term disability benefits to Plaintiff, assuming she continues to be unable to work, fulfills the purposes and goals of the Plan.

4. <u>Whether Aetna's Interpretation was Consistent with Other Provisions in the Plan and with Earlier Interpretation of the Plan</u>

The fourth *Booth* factor is whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan. As discussed above, the Court finds that Aetna's initial termination was not fully consistent with the terms of the Plan related to substantiating her claim and allowing Aetna to require Plaintiff to be examined. Also, Plaintiff contends that Aetna's decision to terminate Plaintiff's disability benefits without requesting that she undergo an updated FCE (or a physical examination by an Aetna selected doctor) was not consistent with Defendant's earlier interpretation of the plan. The Court agrees.

Earlier in the life of Plaintiff's claim, the Claims Paying Administrator was faced with a similar situation. As in 2018-2019, Plaintiff's disability claim was denied in June 2004 purportedly based on the lack of objective medical evidence. The reviewing physician in 2004 noted "[t]here are no studies performed," "there was no FCE performed," and "there are insufficient quantitative objective physical findings." AR 00416. In order to obtain that objective evidence, Defendant requested that Plaintiff undergo an FCE, which she did. The results of that FCE demonstrated that

18

Plaintiff was disabled from performing any work for minimum of 25 hours per week and thus entitled to disability benefits under the Plan. In contrast, when Aetna had the same situation in 2018-2019 (its "peer review" doctors opining that Plaintiff had presented insufficient "objective" evidence of disability), Aetna did not interpret the plan to request that Plaintiff undergo an FCE or an MRI as suggested by Dr. Ellis. Instead, Aetna simply terminated her benefits and denied her appeal. Therefore, Aetna applied the terms of the plan differently in 2004 than in 2018-19 and the fourth *Booth* factor thus favors the Plaintiff.

5. <u>Did the Plan Make a Reasoned and Principled Decision</u>?

The fifth *Booth* factor explores whether a fiduciary's decision-making process was reasoned and principled. Plaintiff argues that Aetna's process failed to meet this standard because the medical evidence in the record – both before and after the termination of her benefits as of September 30, 2018 – reflected the near universal conclusion of her internists and neurologists that she was disabled to the point that she could not work at least 25 hours a week. "A fiduciary that glosses over an analysis that would direct an award[,] in favor of an analysis that would support denial of benefits[,] does not engage in a principled and reasoned decision making process." *L.B. ex rel. Brock v. United Behav. Health, Inc.*, 47 F. Supp. 3d 349, 360 (W.D.N.C. 2014); *see also Thomas v. Alcoa Inc.*, No. CIV.A.RDB-07-1670, 2008 WL 4164156, at *11 (D. Md. Sept. 5, 2008) (finding that plan fiduciaries abused their discretion in terminating benefits without seeking independent testing where claimant "was examined by four treating physicians over a prolonged period of time who consistently certified that he was totally disabled").[10]

---

[10] As in this case, the plan in *Thomas* specifically permitted the defendant to require such testing at its option. While independent examinations are not required, they are common in ERISA cases,

In response, Defendant relies on the reports of its "peer review" physicians who concluded that Plaintiff had failed to submit sufficient "objective findings" to support a continued inability to engage in compensable employment and other medical evidence from 2015 and earlier which it argues shows that Plaintiff can work at least 25 hours a week. In sum, Defendant argues that it was up to Plaintiff to prove she was disabled with more specific medical evidence than she presented and thus it was reasonable for Aetna to terminate her disability benefits without requesting additional examinations to actually determine if she remained unable to work (as Aetna agreed that she had for the past 17 years).

"A reversal of a decision of disability may warrant significant skepticism when substantial evidence does not support the conclusion that the disability has ceased." *Thomas*, 2008 WL 4164156, at \*10 (citing *Adelson v. GTE Corp.*, 790 F. Supp. 1265, 1273 (D. Md. 1992)). While the Fourth Circuit does not require a plan to show a change in condition in order to deny a claim for disability benefits, a denial without "new medical information to justify that decision [should be treated with] significant skepticism." *Anderson v. Reliance Std. Life Ins. Co.*, 2013 U.S. Dist. LEXIS 41009, \*27-\*28. Most relevant here, an inconsistent review process may indicate an abuse of discretion. *See Thomas*, 2008 WL 4164156, at \*12.

In *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21-23 (4th Cir. 2014), the Fourth Circuit addressed similar circumstances as are presented here, finding that the plan fiduciaries abused their discretion in failing to seek additional medical information where "the record did not refute [claimant's] claim of disability." The court stated:

_____

and courts are wary of conflicted administrators who deny benefits without utilizing them. *See, e.g., Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp.2d 645, 649–50 (D. Md. 2002); *Watson v. UnumProvident Corp.*, 185 F. Supp.2d 579, 581–82 (D. Md. 2002)

20

While the primary responsibility for providing medical proof of disability undoubtedly rests with the claimant, a plan administrator cannot be willfully blind to medical information that may confirm the beneficiary's theory of disability where there is no evidence in the record to refute that theory. *See Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807 (10th Cir. 2004). ERISA does not envision that the claims process will mirror an adversarial proceeding where "the [claimant] bear[s] almost all of the responsibility for compiling the record, and the [fiduciary] bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim." *Id.* Rather, the law anticipates, where necessary, some back and forth between administrator and beneficiary.

An administrator is also "required to use a deliberate, principled reasoning process and to support its decision with substantial evidence." *McKoy v. Int'l Paper Co.,* 488 F.3d 221, 223 (4th Cir. 2007). A complete record is necessary to make a reasoned decision, which must "rest on good evidence and sound reasoning; and ... result from a fair and searching process." *Evans,* 514 F.3d at 322–23. A searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support a successful claim. As the Tenth Circuit explained, "[a]n ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Gaither,* 394 F.3d at 808.

*Id.* at 21. This Court finds that the reasoning in *Harrison* is equally applicable here. The long history of Plaintiff's medical treatment establishes that her treating physicians consistently held the opinion that she was "disabled from performing any constant job" and "remained significantly impaired in the performance of most activities of daily living." *See* AR 00027, 00409. In light of that record, Aetna's failure to make more of an effort "to get to the truth of the matter" undermines Defendant's claim that it used a deliberate, principled reasoning process.[11] *See Wilkinson v. Sun*

---

[11] While the record does reflect that Aetna's "peer review" physicians attempted to communicate with Plaintiff's overseas doctors, Aetna never informed Plaintiff (until it was too late to do anything about it other than file this action) that her doctors had not responded to requests for information nor did it request the MRI that Dr. Ellis suggested should be performed to assess Plaintiff's functional limitations. "It is not asking too much that, in the course of a 'full and fair review,' *see* 29 U.S.C. § 1133, administrators notify a claimant of specific information that they were aware was missing and that was material to the success of the claim." *Harrison*, 773 F.3d at 21.

*Life & Health Ins. Co.*, 674 F. App'x 294 (4th Cir. 2017) (finding that plan administrator cannot ignore "readily available" information that is needed for review of a claim for benefits); *Thomas*, 2008 WL 4164156, at *10-*12.

Finally, the evidence repeatedly argued by Defendant as establishing that Plaintiff's physicians believed she could work is not only unpersuasive but further undermines the credibility of Defendant's reexamination of Plaintiff's benefit claims. In its opening brief in support of its motion, Defendant argued that "in November 2015, Dr. Adam Shapiro, Plaintiff's long time healthcare provider, responded to Aetna's request for updated medical information and advised that Plaintiff **could work** any compensable employment for a minimum of twenty-five (25) hours per week." Doc. No. 36 at 6-7 (emphasis in original). However, Dr. Shapiro did not treat Plaintiff for the medical issues that caused her disability. Instead, Dr. Shapiro is a *podiatrist* who saw Plaintiff for a foot issue that appears to be completely irrelevant to the issues before the Court. *See* AR 00399.

And, Defendant only compounded this misrepresentation in its reply brief when it again told the court that "Plaintiff's own providers felt she was capable of working at least twenty-five (25) hours per week, including Dr. Binit Shah and Dr. Schwartz, who both treated Plaintiff for her back pain." Doc. 42 at 4-5. With respect to Dr. Schwartz, although he did opine in February 2009 that Plaintiff could do sedentary work with restrictions, AR 00285, the record reflects that by July 2009 he believed that "Patient is totally disabled" and could not work a minimum of 25 hour a week at any occupation (a conclusion he repeated in September 2009). AR 00287-00288.

As for Dr. Shah, he saw Plaintiff only once in 2012 to consider "alternative treatments" (spinal cord stimulation) that might be available to her. He later completed a form from Aetna,

checking a box that said that Plaintiff could work for "minimum of twenty-five hours a week (i.e. sedentary job for 25 hours a week)." AR 00307. Given the very limited circumstances of Dr. Shah's relationship with Plaintiff in 2012 and the fact that Aetna continued to pay benefits to Plaintiff for more than six years after receiving Dr. Shah's form (perhaps because all her other doctors said she was totally disabled) this evidence also could not be a reasoned or principled ground to terminate Plaintiff's disability benefits.

Further, Defendant argues that "… Lakeside Family Physicians, changed their opinion[] as to Plaintiff's inability to work and informed Aetna that Plaintiff, in fact, could work any compensable employment for a minimum of twenty-five (25) hours per week and that they had no records substantiating her continued need to be out of work." Doc. No. 40 at 10. The referenced May 2015 communication from Lakeside Family Physicians in response to Aetna's form request for documents states as follows:

> We will not be completing this claim or info. We have no medical records substantiating her continued need to be out of work. Please send this to her neurologist [and] pain management physicians for completion. They have the most appropriate info that you need.

(AR 0388). This response (to the extent a 2015 communication has relevance to a 2018-2019 termination of benefits) does not establish that Plaintiff's doctor at Lakeside Family Physicians believed she could work. In fact, Dr. Barbara Meyer opined – in the page of the record immediately preceding the pages cited by Defendant – that Plaintiff was unable to work at any compensable employment for a minimum of 25 hours a week. AR 00386. Instead, this brief note appears to indicate that because the Lakeside practice was not planning any future office visits with Plaintiff, *id.*, that it would be best for Aetna to send the request to Plaintiff's neurologist and pain

management physician who would possess "the most appropriate info that you need" to evaluate any "continued" need to be out of work. AR 00387 – 00388.[12]

Therefore, the Court finds that Defendant failed to engage in a reasonable and principled decision process and the fifth *Booth* factor, as with the others discussed above, supports Plaintiff. Accordingly, in summary, after considering the relevant *Booth* factors and Fourth Circuit precedent, the Court concludes that Defendant abused its discretion in terminating Plaintiff's long term disability benefits without a full and fair review of her claim.

**Remand is the Appropriate Remedy**

Having determined that Defendant abused its discretion in terminating Plaintiff's disability benefits, "the Court must [now] decide what the appropriate remedy is—whether to remand to the administrator or directly grant benefits." *Montero v. Bank of Am. Long-Term Disability Plan*, No. 315CV00519RJCDSC, 2016 WL 7444957 at *6 (W.D.N.C. Dec. 27, 2016). While the Fourth Circuit has indicated that "remand should be used sparingly," *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985), "where a court believes that an administrator lacked adequate evidence in making its determination, the appropriate remedy is to remand the case to the administrator." *Sapp v. Liberty Life Assurance Co. of Bos.*, 210 F. Supp. 3d 846, 855 (E.D. Va. 2016). "Remand is most appropriate 'where the plan itself commits the trustees to consider relevant information which they failed to consider or where [the] decision involves records that were readily available and records that trustees had agreed that they would verify.'" *Elliott v. Sara*

---

[12] The Court views Defendant's counsel's multiple misrepresentations discussed above as a very serious matter and a likely breach of their duty of candor to the Court. In the event that this matter returns to the Court after the remand ordered below, the Court may require counsel to show cause why their pro hac vice admission should not be revoked or sanctions should not be imposed.

24

*Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999) (quoting *Berry*, 761 F.2d at 1008). As discussed at length above, the primary obstacles to a full and fair review of the Plan's termination of Plaintiff's disability benefits are the absence of an updated FCE, an MRI and communications with two of Plaintiff's overseas medical providers. Accordingly, this matter should be remanded to the Plan for a full and fair review of Plaintiff's claim for disability benefits after she has a reasonable opportunity[13] to provide this information and respond to the new information included in Aetna's denial of her earlier appeal of the termination of her benefits.

---

[13] This "reasonable opportunity" must, of course, take into account the ongoing medical and travel disruptions and restrictions associated with the Covid-19 pandemic.

## ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Defendant's Motion for Summary Judgment (Doc. No. 35) is **DENIED;**

2.  Plaintiff's Motion for Summary Judgment (Doc. No. 33) is **GRANTED** to the extent it seeks a remand to the Plan; and

3.  This matter is **REMANDED** to the Defendant for further proceedings in accordance with this Order, including, but not limited to, a full and fair review of Plaintiff's claim for long term disability following a reasonable opportunity for Plaintiff to respond to all of the information being considered by Defendant and its Claims Paying Administrator (Aetna) and provide an MRI, functional assessment and other relevant materials.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: April 12, 2021

Kenneth D. Bell
United States District Judge

26